FRED MARTELL *vs.* JAMES N. WHITE & others.

Norfolk.    December 9, 1902. — March 1, 1904.

Present: KNOWLTON, C. J., MORTON, LATHROP, BARKER, & HAMMOND, JJ.

*Conspiracy*, Civil action.

In an action of tort for an alleged conspiracy to injure the plaintiff in his business, it appeared, that the plaintiff was engaged in the business of quarrying granite and selling it to granite workers, and that the defendants were members of a voluntary association of granite workers, who, by the enforcement of a by-law imposing heavy fines for its violation, were coerced into refusing to trade with the plaintiff because he was not a member of the association, whereby his business was ruined. *Held*, that it was error to order a verdict for the defendants, and that the case should have been submitted to the jury.

TORT for an alleged conspiracy to injure the plaintiff in his business of quarrying and selling granite, carried on by him at Quincy. Writ dated March 9, 1899.

In the Superior Court the case was tried before *Bishop*, J., who, at the conclusion of the evidence, ruled that the plaintiff could not recover, and ordered a verdict for the defendants. The plaintiff alleged exceptions.

*E. R. Anderson*, for the plaintiff.

*J. W. McAnarney*, (*J. E. Cotter* with him,) for the defendants.

HAMMOND, J. The evidence warranted the finding of the following facts, many of which were not in dispute. The plaintiff was engaged in a profitable business in quarrying granite and selling the same to granite workers in Quincy and vicinity. About January, 1899, his customers left him, and his business was ruined through the action of the defendants and their associates.

The defendants were all members of a voluntary association known as the Granite Manufacturers' Association of Quincy, Massachusetts, and some of them were on the executive committee. The association was composed of "such individuals, firms, or corporations as are, or are about to become manufacturers, quarriers, or polishers of granite." There was no constitution and, while there were by-laws, still, except as hereinafter stated,

there was in them no statement of the objects for which the association was formed. The by-laws provided among other things for the admission, suspension and expulsion of members, the election of officers, including an executive committee, and defined the respective powers and duties of the officers. One of the by-laws read as follows : " For the purpose of defraying in part the expense of the maintenance of this organization, any member hereof having business transactions with any party or concern in Quincy or its vicinity, not members hereof, and in any way relating to the cutting, quarrying, polishing, buying or selling of granite (hand polishers excepted) shall for each of said transactions contribute at least $1 and not more than $500. The amount to be fixed by the association upon its determining the amount and nature of said transaction."

Acting under the by-laws, the association investigated charges which were made against several of its members that they had purchased granite from a party "not a member" of the association. The charges were proved, and under the section above quoted it was voted that the offending parties should respectively " contribute to the funds of the association " the sums named in the votes. These sums ranged from $10 to $100. Only the contribution of $100 has been paid, but it is a fair inference that the proceedings to collect the others have been delayed only by reason of this suit. The party " not a member " was the present plaintiff, and the members of the association knew it. Most of the customers of the plaintiff were members of the association, and after these proceedings they declined to deal with him. This action on their part was due to the course of the association in compelling them to contribute as above stated, and to their fear that a similar vote for contribution would be passed should they continue to trade with the plaintiff.

The jury might properly have found also that the euphemistic expression " shall . . . contribute " to the funds of the association contained an idea which could be more tersely and accurately expressed by the phrase " shall pay a fine," or, in other words, that the plain intent of the section was to provide for the imposition upon those who came within its provisions of a penalty in the nature of a substantial fine. The bill of exceptions recites that " there was no evidence of threats or intimidation

practised upon the plaintiff himself, and the acts complained of were confined to the action of the society upon its own members." We understand this statement to mean simply that the acts of the association concerned only such of the plaintiff's customers as were members, and that no pressure was brought to bear upon the plaintiff except such as fairly resulted from action upon his customers. While it is true that the by-law was not directed expressly against the plaintiff by name, still he belonged to the class whose business it was intended to affect, and the proceedings actually taken were based upon transactions with him alone, and in that way were directed against him alone. It was the intention of the defendants to withdraw his customers from him, if possible, by the imposition of fines upon them, with the knowledge that the result would be a great loss to the plaintiff. The defendants must be presumed to have intended the natural result of their acts.

Here, then, is a clear and deliberate interference with the business of a person with the intention of causing damage to him and ending in that result. The defendants combined and conspired together to ruin the plaintiff in his business, and they accomplished their purpose. In all this have they kept within lawful bounds?

It is elemental that the unlawfulness of a conspiracy may be found either in the end sought or the means to be used. If either is unlawful within the meaning of the term as applied to the subject, then the conspiracy is unlawful. It becomes necessary, therefore, to examine into the nature of the conspiracy in this case, both as to the object sought and the means used.

The case presents one phase of a general subject which gravely concerns the interests of the business world and indeed those of all organized society, and which in recent years has demanded and received great consideration in the courts and elsewhere. Much remains to be done to clear the atmosphere, but some things at least appear to have been settled, and certainly at this stage of the judicial inquiry it cannot be necessary to enter upon a course of reasoning or to cite authorities in support of the proposition that while a person must submit to competition he has the right to be protected from malicious interference with his business. The rule is well stated in *Walker* v. *Cronin,*

107 Mass. 555, 564, in the following language : " Every one has a right to enjoy the fruits and advantages of his own enterprise, industry, skill and credit. He has no right to be protected against competition ; but he has a right to be free from malicious and wanton interference, disturbance or annoyance. If disturbance or loss come as a result of competition, or the exercise of like rights by others, it is *damnum absque injuria,* unless some superior right by contract or otherwise is interfered with. But if it come from the merely wanton or malicious acts of others, without the justification of competition or the service of any interest or lawful purpose, it then stands upon a different footing."

In a case like this, where the injury is intentionally inflicted, the crucial question is whether there is justifiable cause for the act. If the injury be inflicted without just cause or excuse, then it is actionable. Bowen, L. J. in *Mogul Steamship Co.* v. *McGregor,* 23 Q. B. D. 598, 613. *Plant* v. *Woods,* 176 Mass. 492. The justification must be as broad as the act and must cover not only the motive and the purpose, or in other words the object sought, but also the means used.

The defendants contend that both as to object and means they are justified by the law applicable to business competition. In considering this defence it is to be remembered, as was said by Bowen, L. J. in *Mogul Steamship Co.* v. *McGregor,* 23 Q. B. D. 598, 611, that there is presented " an apparent conflict or antinomy between two rights that are equally regarded by the law — the right of the plaintiffs to be protected in the legitimate exercise of their trade, and the right of the defendants to carry on their business as seems best to them, provided they commit no wrong to others." Here, as in most cases where there is a conflict between two important principles, either of which is sound and to be sustained within proper bounds, but each of which must finally yield to some extent to the other, it frequently is not possible by a general formula to mark out the dividing line with reference to every conceivable case, and it is not wise to attempt it. The best and only practicable course is to consider the cases as they arise, and, bearing in mind the grounds upon which the soundness of each principle is supposed to rest, by a process of elimination and comparison to establish points through

which at least the line must run and beyond which the party charged with trespass shall not be allowed to go.

While the purpose to injure the plaintiff appears clearly enough, the object or motive is left somewhat obscure upon the evidence. The association had no written constitution, and the by-laws do not expressly set forth its objects. It is true that from the by-laws it appears that none but persons engaged in the granite business can be members, and that a member transacting any business of this kind with a person not a member is liable to a fine; from which it may be inferred that it is the idea of the members that for the protection of their business it would be well to confine it to transactions among themselves, and that one at least of the objects of the association is to advance the interests of the members in that way. The oral testimony tends to show that one object of the association is to see that agreements made between its members and their employees and between this association and similar associations in the same line of business be kept and " lived up to." Whether this failure to set out fully in writing the objects is due to any reluctance to have them clearly appear, or to some other cause, is of course not material to this case. The result, however, is that its objects do not so clearly appear as might be desired ; but in view of the conclusion to which we have come as to the means used, it is not necessary to inquire more closely as to the objects. It may be assumed that one of the objects was to enable the members to compete more successfully with others in the same business, and that the acts of which the plaintiff complains were done for the ultimate protection and advancement of their own business interests, with no intention or desire to injure the plaintiff except so far as such injury was the necessary result of measures taken for their own interests. If that was true, then so far as respects the end sought the conspiracy does not seem to have been illegal.

The next question is whether there is anything unlawful or wrongful in the means used as applied to the acts in question. Nothing need be said in support of the general right to compete. To what extent combination may be allowed in competition is a matter about which there is as yet much conflict, but it is possible that in a more advanced stage of the discussion the day

may come when it will be more clearly seen and will more distinctly appear in the adjudication of the courts·than as yet has been the case, that the proposition that what one man lawfully can do any number of men acting together by combined agreement lawfully may do, is to be received with newly disclosed qualifications arising out of the changed conditions of civilized life and of the increased facility and power of organized combination, and that the difference between the power of individuals acting each according to his own preference and that of an organized and extensive combination may be so great in its effect upon public and private interests as to cease to be simply one of degree and to reach the dignity of a difference in kind.    Indeed, in the language of Bowen, L. J. in the *Mogul Steamship* case, *ubi supra*, page 616 : " Of the general proposition, that certain kinds of conduct not criminal in any one individual may become criminal if done by combination among several, there can be no doubt.    The distinction is based on sound reason, for a combination may make oppressive or dangerous that which if it proceeded only from a single person would be otherwise, and the very fact of the combination may show that the object is simply to do harm, and not to exercise one's own just rights."    See also opinion of Stirling, L. J. in *Giblan* v. *National Amalgamated Labourers' Union*, [1903] 2 K. B. 600, 621.    Speaking generally, however, competition in business is permitted, although frequently disastrous to those engaged in it.    It is always selfish, often sharp, and sometimes deadly. Conspicuous illustrations of the destructive extent to which it may be carried are to be found in the *Mogul Steamship* case above cited, and in *Bowen* v. *Matheson*, 14 Allen, 499.    The fact therefore that the plaintiff was vanquished is not enough, provided that the contest was carried on within the rules allowable in such warfare.

It is a right, however, which is to be exercised with reference to the existence of a similar right on the part of others.    The trader has not a free lance.    Fight he may, but as a soldier, not as a guerilla.    The right of competition rests upon the doctrine that the interests of the great public are best subserved by permitting the general and natural laws of business to have their full and free operation, and that this end is best attained when

the trader is allowed in his business to make free use of these laws. He may praise his wares, may offer more advantageous terms than his rival, may sell at less than cost, or, in the words of Bowen, L. J. in the *Mogul Steamship* case, *ubi supra*, may adopt " the expedient of sowing one year a crop of apparently unfruitful prices, in order by driving competition away to reap a fuller harvest of profit in the future." In these and many other obvious ways he may secure the customers of his rival, and build up his own business to the destruction of that of others, and so long as he keeps within the operation of the laws of trade his justification is complete.

But from the very nature of the case it is manifest that the right of competition furnishes no justification for an act done by the use of means which in their nature are in violation of the principle upon which it rests. The weapons used by the trader who relies upon this right for justification must be those furnished by the laws of trade, or at least must not be inconsistent with their free operation. No man can justify an interference with another man's business through fraud or misrepresentation, nor by intimidation, obstruction or molestation. In the case before us the members of the association were to be held to the policy of refusing to trade with the plaintiff by the imposition of heavy fines, or in other words they were coerced by actual or threatened injury to their property. It is true that one may leave the association if he desires, but if he stays in it he is subjected to the coercive effect of a fine to be determined and enforced by the majority. This method of procedure is arbitrary and artificial, and is based in no respect upon the grounds upon which competition in business is permitted, but on the contrary it creates a motive for business action inconsistent with that freedom of choice out of which springs the benefit of competition to the public, and has no natural or logical relation to the grounds upon which the right to compete is based. Such a method of influencing a person may be coercive and illegal. *Carew* v. *Rutherford*, 106 Mass. 1.

Nor is the nature of the coercion changed by the fact that the persons fined were members of the association. The words of Munson, J. in *Boutwell* v. *Marr*, 71 Vt. 1, 9, are applicable here : " The law cannot be compelled by any initial agreement

of an associate member to treat him as one having no choice but that of the majority, nor as a willing participant in whatever action may be taken. The voluntary acceptance of by-laws providing for the imposition of coercive fines does not make them legal and collectible, and the standing threat of their imposition may properly be classed with the ordinary threat of suits upon groundless claims. The fact that the relations and processes deemed essential to a recovery are brought within the membership and proceedings of an organized body, cannot change the result. The law sees in the membership of an association of this character both the authors of its coercive system and the victims of its unlawful pressure. If this were not so, men could deprive their fellows of established rights, and evade the duty of compensation, simply by working through an association."

In view of the considerations upon which the right of competition is based, we are of opinion that as against the plaintiff the defendants have failed to show that the coercion or intimidation of the plaintiff's customers by means of a fine is justified by the law of competition. The ground of the justification is not broad enough to cover the acts of interference in their entirety, and the interference, being injurious and unjustifiable, is unlawful.

We do not mean to be understood as saying that a fine is of itself necessarily, or even generally, an illegal instrument. In many cases it is so slight as not to be coercive in its nature; in many it serves a useful purpose to call the attention of a member of an organization to the fact of the infraction of some innocent regulation; and in many it serves as an extra incentive to the performance of some absolute duty or the assertion of some absolute right. But where, as in the case before us, the fine is so large as to amount to moral intimidation or coercion, and is used as a means to enforce a right not absolute in its nature but conditional, and is inconsistent with the conditions upon which the right rests, then the coercion becomes unjustifiable and taints with illegality the act.

The defendants strongly rely upon *Bowen* v. *Matheson*, 14 Allen, 499, *Mogul Steamship Co.* v. *McGregor*, [1892] A. C. 25, *Bohn Manuf. Co.* v. *Hollis*, 54 Minn. 223, *Macauley Brothers* v.

*Tierney*, 19 R. I. 255, and *Cote* v. *Murphy*, 159 Penn. St. 420. In none of these cases was there any coercion by means of fines upon those who traded with the plaintiff. Inducements were held out, but they were such as are naturally incident to competition, for instance, more advantageous terms in the way of discounts, increased trade, and otherwise. In the Minnesota case there was among the rules of the association a clause requiring the plaintiff to pay ten per cent, but the propriety or the legality of that provision was not involved. In *Bowen* v. *Matheson*, it is true that the by-laws provided for a fine, but the declaration did not charge that any coercion by means of a fine had been used. A demurrer to the declaration was sustained upon the ground that there was no sufficient allegation of an illegal act. The only allegation which need be noticed here was that the defendants "did prevent men from shipping with" the plaintiff, and as to this the court said: "This might be done in many ways which are lawful and proper, and as no illegal methods are stated the allegation is bad." This comes far short of sustaining the defendants in their course of coercion by means of fines. As to the other cases cited by the defendant it may be said that, while bearing upon the general subject of which the present case presents one phase, they are not inconsistent with the conclusion to which we have come. Among the authorities bearing upon the general subject and having some relation to the questions involved in this case, see, in addition to those hereinbefore cited, *Slaughter-House cases*, 16 Wall. 36, 116 ; *Addyston Pipe & Steel Co.* v. *United States*, 175 U. S. 211; *Doremus* v. *Hennessy*, 176 Ill. 608 ; *Inter-Ocean Publishing Co.* v. *Associated Press*, 184 Ill. 438 ; *State* v. *Stewart*, 59 Vt. 273 ; *Olive* v. *Van Patten*, 7 Tex. App. 630 ; *Barr* v. *Essex Trades Council*, 8 Dick. 101; *Jackson* v. *Stanfield*, 137 Ind. 592 ; *Bailey* v. *Master Plumbers*, 103 Tenn. 99 ; *Brown* v. *Jacobs' Pharmacy Co.* 115 Ga. 429; *Mogul Steamship Co.* v. *McGregor*, 15 Q. B. D. 476 ; 21 Q. B. D. 544 ; 23 Q. B. D. 598 ; [1892] A. C. 25.

For the reasons above stated, a majority of the court are of opinion that the case should have been submitted to the jury.

*Exceptions sustained.*